## NORWICH UNION FIRE INS. SOC., LIMITED, OF NORWICH AND LONDON, ENGLAND, v. LEO BROS. CO.

## NEW BRUNSWICK FIRE INS. CO. v. SAME.

(Circuit Court of Appeals, Ninth Circuit.  April 21, 1924.)

No. 4140.

**Insurance ⟲665(2)—Evidence held sufficient to show fire policies covered tank in rear of factory.**

In an action on fire policies, evidence *held* sufficient to show that the policies were intended to cover tank in the rear of the main building, connected therewith by a shed roof.

In Error to the District Court of the United States for the Central Division of the District of Idaho; Frank S. Dietrich, Judge.

Separate actions by the Leo Bros. Company against the Norwich Union Fire Insurance Society, Limited, of Norwich and London, England, and against the New Brunswick Fire Insurance Company. Judgments for plaintiff, and defendants bring error. Affirmed.

E. Eugene Davis, of Spokane, Wash., C. J. Orland, of Moscow, Idaho, and H. B. M. Miller, of San Francisco, Cal., for plaintiffs in error.

Frank L. Moore, of Moscow, Idaho, for defendant in error.

Before HUNT, RUDKIN, and MORROW, Circuit Judges.

HUNT, Circuit Judge. Leo Bros. Company, a corporation, defendant in error, brought actions against the Norwich Union Fire Insurance Society, Limited, and the New Brunswick Fire Insurance Company, respectively, to recover upon two policies of fire insurance. The cases were consolidated for trial to the court without a jury. Judgment was entered in favor of the plaintiff, and the insurance companies, plaintiffs in error, brought writ of error. For convenience we refer to the parties as they appeared in the District Court.

Leo Bros. Company had a cider and vinegar factory in Moscow, Idaho. The Veatch Realty Company, a partnership composed of Fred and M. J. Veatch, was the agent of both insurance companies, and as such agent issued and delivered to plaintiff, upon the payment of the respective premiums, policies of fire insurance in the Norwich Union for $5,000, and in the New Brunswick for $6,000, whereby the respective companies insured plaintiff against loss of or damage by fire to merchandise of every description, consisting principally of vinegar and vinegar stock, manufactured or in process of manufacture. In the Norwich Union policy the building was described as "situate at No. 244, on the east side of Main street, between A and C streets, in Moscow, Idaho." The policy referred to the building as a "three-story, comp. roof brick and frame building and its additions (if any) of like construction, communicating and in contact therewith, situate as above." The New Brunswick policy contained substantially the same description of merchandise, followed by these words:

---

"Located and contained as described herein and not elsewhere, to wit, * * * being the property insured or sold, but not removed, * * * all only while contained in the three-story comp. roof brick and one-story frame building and its additions, if any, of like construction, communicating and in contact therewith situate as above, * * * all situate No. 244 on the southeast corner of Main and C streets, in Moscow, Idaho."

At the bottom of the policies were the following notations:

"Insurance Map, Sheet 4, Block 102, No. 244."

Fire damaged the vinegar in certain tanks in a tank shed belonging to plaintiff, and the question is whether the property destroyed by the fire was covered by the contracts of insurance.

There is no controversy over the fact that block 102 and the streets designated as bounding the block have relation to the town-site plat of Moscow, and that No. 244 has reference to an insurance map spoken of as the Sanborn map, which was used by all insurance companies and their agents in issuing policies, making rate sheets and reports. The vinegar factory was in the northwest corner of block 102, fronting on Main street, at the corner of C street. The factory itself was in a brick building on the corner, which ran back to an alley. The tank shed was south of the main building and extended back, but not quite, to the alley. Between the tank building and the main building, at the rear end of the tank building, there was a connection by means of a shed roof, and between the factory and tank building there was a driveway from Main street to the west side of the shed connection just referred to. All of the parts, tanks and main building, were used as a single manufacturing plant.

It is argued by the insurance companies that the parties had constituted the two buildings as two separate and distinct risks, and that the property was insured only "while located and contained as described herein and not elsewhere," and that the insurance covered the property only "while contained in the three-story comp. roof * * * situate as above." Construing the contracts as justifying evidence of extrinsic facts, in order to enable the court better to understand the situation, Veatch, who wrote the policies, testified concerning the circumstances surrounding the issuance of the policies, the rates, the rules applicable to different risks, and how hazards are regarded. On the Sanborn map of block 102, "No. 244" appears in front of the Main street line of the manufacturing part of the plaintiff's property. No figures appear in front of the vinegar tank property. This matter assumed importance, as Veatch, who was agent for some other fire insurance companies, had at previous times filled out policies in which the vinegar tank shed risk was described as *No. 240* on the east side of Main street, and in pencil had written "240" opposite the tank shed shown on the Sanborn map in his possession.

Veatch, however, explained this by saying that, when Leo Bros. started to put a small shed building on the south side of the ground, they put up three tanks only, and the shed was boarded up on two sides, and that he had at that time estimated how the city numbered the premises for the distance between two numbers, and for his own convenience he put "240" on the old map, and had inadvertently writ-

ten "240" on one of the policies, which was first written in 1913 or 1914, and thereafter in renewals, for his own information, had used "240" as covering the vinegar, merely to keep from looking through his record to show the specific insurance he wanted to cancel; that where he numbered in his report "240," on the east side of Main street, the risk was a special hazard, and that when the report of a special hazard was sent into the home office, a traveling agent was sent to inspect the risk, and in the present matter what had been reported in policies as No. "240" had been accepted by the special agent of every company that had a policy on the property since 1911; that his reports to the companies which carried the number "240" also carried a description of the property as between A and C streets, on Main street; that his reports showed the rate of insurance and the descriptive clause of the policy, from all of which the company could readily understand that the rate of $2.50 per hundred carried insurance upon vinegar in any part of the plant, and that policies carrying the lower rate of $2.45 would cover vinegar or vinegar products only while located in the vinegar tanks in the tank shed. The number "240" does not appear in the book of specific rates as those rates related to the manufacturing plant of Leo Bros. The form which was used by Veatch as agent, and attached to the daily report blank to the general agent of the Norwich Union policy, designated the risk with reference to the page and line of a book of specific rates "page 3 line 2." In the daily report of the New Brunswick policy the rate book reference seems to have been left blank, but the rate of $2.50 was given, and the rate book used for block 102, line 2, gave the specific rate for the vinegar factory $2.50 per hundred on building and contents —building and contents taking the same rate of insurance. The third line of the rate book page also gives the specific rate on the part of the building marked "Vinegar Tanks" and contents at $2.45 per hundred.

What Veatch said seems very reasonable, that from the information given insurance men would know that insurance reported at $2.50 covered the entire plant, while any reported at $2.45 would be only coverage for that part of the plant specified "Vinegar Tanks" in the rate book. Veatch explained that two rates were sometimes carried, the $2.50 and $2.45, under one cover, because the quantity of vinegar was being moved frequently from one part of the plant to the other, and, there being no practical, simple way of keeping track of the quantities in one or the other part at all times, the custom was to carry a certain amount of specific insurance at the $2.45 rate on the contents of the tanks described as "240," and as the stock of vinegar went down to "cancel on that stuff." The insurance companies say, however, that the rules under which the parties contracted prohibited the writing of insurance under a blanket policy covering under one sum separate and distinct risks or items without use of a coinsurance or reduced rate average clause, and that Veatch in part of his evidence recognized such prohibition.

The rule relied upon, prohibiting blanket policies in cases indicated, contains the exception that policies covering under one sum merchan-

dise contained in warehouses and on their adjoining platforms, or cars alongside, shall be considered as complying with the rule requiring different items of hazard to be specifically insured. Veatch, as an experienced insurance man, said the rules did not forbid the writing of a blanket policy upon an entire plant, where, as here, the highest rate applicable was charged, and that by his understanding of the rules application of the coinsurance reduced rate average clause is only where there are two buildings covered by one policy. The testimony of the insurance expert called by defendants is not inconsistent with what Veatch said, for he recognized that insurance can be written under a blanket policy with the highest rate applicable; that, too, without containing a reduced rate average clause and a coinsurance clause.

Elucidation of the evidence is had by reference to Tariff Rules, page 4, where it is provided that, when two or more buildings used for any of the purposes described, adjoining or adjacent, are occupied by the same firm for a common purpose, so that the buildings, although separated, virtually constitute a single hazard, they need not be charged for as exposures to each other, provided the highest basis rate of any of the buildings so adjoining or adjacent is made the basis rate for each one of said buildings according to its class; otherwise, each building taking its proper basis rate in accordance with the rule for determining rate of premium must be subject to the charge for exposures as per the table of exposures. One of the lists referred to in the rule includes clusters of buildings forming a manufacturing establishment. Veatch testified that the form used in the policies, where it said "additions communicating and in contact therewith," covered the vinegar wherever located in the plant.

The peculiar relationship of Veatch to the parties has prompted very careful examination of his testimony, but it has withstood such scrutiny, and in connection with the whole case has led us to the conclusion that the premises were considered by all concerned as a manufacturing plant in one building, connected in its parts, and that the use of "240" was solely for the convenience of Veatch in canceling insurance on the vinegar where the special rate of $2.45 was employed.

The judgment is affirmed.